[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 15, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13880
Non-Argument Calendar

_____

Agency No. A79-059-180

BUDI CANDRA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 15, 2007)

Before ANDERSON, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Budi Candra petitions for review of the final order of the Board of

Immigration Appeals ("BIA"), which adopted and affirmed the Immigration

Judge's ("IJ") dismissal of Candra's asylum claim as time-barred and denial of his request for withholding of removal. After review, we dismiss in part and deny in part Candra's petition for review.

## I. BACKGROUND

**A.    Candra's Application and Testimony**

On September 24, 2000, Candra, a native and citizen of Indonesia, entered the United States as a non-immigrant visitor for pleasure with authorization to remain until March 23, 2001. Candra stayed in the United States past the authorized six-month period. On April 30, 2003, the Immigration and Naturalization Service ("INS") served Candra with a notice to appear, charging him with removability for overstaying his visa, pursuant to INA § 237(a)(1)(B), (a)(1)(C)(i), 8 U.S.C. § 1227(a)(1)(B), (a)(1)(C)(i).

On March 10, 2004, Candra filed an application for asylum, withholding of removal and relief under the United Nations Convention Against Torture ("CAT"), alleging persecution in Indonesia based on his race, ethnic Chinese, and religion, Buddhist. According to Candra's asylum application and hearing testimony, Candra experienced three incidents of alleged persecution while in Indonesia.

First, in 1995, while attending a Catholic high school, Candra was involved in a fight between Chinese students from his school and students from a Muslim school. As Candra turned to run and get help from a teacher, he was hit from

behind with a brick and knocked unconscious. He also was hit with a stick on the chest and arm. Candra was treated at the hospital for bruises. He reported the incident to the police, but received no indication that an investigation took place.

The second incident occurred in 1997. Candra was riding a bus that stopped in front of a Muslim school and picked up some passengers. One of these passengers held a knife to Candra's stomach and demanded money. As he did so, the robber stated to the other passengers, "This is the student from the Chinese school, let's rob him." Candra gave the man his money and got off the bus. He did not report this incident to the police.

The third incident occurred in 1998 while Candra was attending college. During a large anti-corruption demonstration, attended mostly by Chinese students but also by some indigenous Indonesian students, the police began to beat many of the Chinese students, including Candra, with their batons. Candra was injured on his right forearm, but did not seek treatment. He also did not report this incident.

Candra also testified that he had left Indonesia because Muslims, with the help of the Indonesian government, "suppress" ethnic Chinese. Candra noted that, when he turned seventeen, he was required to get identification and change his Chinese name, Xin Pox Yong, to an Indonesian name. Candra's family, including his mother, father and older brother, continue to live in Indonesia, but live in fear because of the unstable situation there.

3

Candra decided to come to the United States because he had relatives who live here. He arrived in September 2000 with his mother. However, his mother returned to Indonesia to assist one of his siblings with her wedding. Candra's mother has since called to tell him she does not feel safe in Indonesia and would like to come to the United States. His parents mostly stay at home and send maids to get food at the market. However, his brother works and consequently leaves the house frequently. Candra decided to apply for asylum because he felt that conditions in Indonesia had not become better and he feared that if he returned his life would be threatened and he would be attacked again.

B.    **Articles**

Candra submitted several news and other articles about the conditions ethnic Chinese face in Indonesia. These articles revealed, among other things, that ethnic Chinese, while a small percentage of the population, have enjoyed economic prosperity in Indonesia. Beginning in the 1950s, the Indonesian government implemented certain laws and economic policies that discriminated against the Chinese, such as prohibiting them from joining the military or civil service or from owning a business beyond the local level and also banning the use of Chinese characters and Chinese language publications and closing Chinese schools and temples. Anti-Chinese sentiments came to a head in May 1998, during the authoritarian rule of President Suharto, when riots broke out targeting ethnic

4

Chinese. During these riots, over a thousand people were killed, including ethnic Chinese, and many Chinese-owned shops and houses were destroyed.

The riots led to the resignation of President Suharto. His successor, President Habibe, issued decrees in 1998 and 1999 ordering government officials to treat all Indonesians the same and banning discrimination based on ethnicity. In 2000, the government repealed laws banning the use of Chinese characters, Chinese language publications and the celebration of the Chinese New Year. Nonetheless, many discriminatory laws remain on the books in Indonesia and ethnic Chinese still face discrimination, often from corrupt government officials who require them to pay bribes.

In October 2004, President Susilo Bambang Yudhoyono and his running mate Jusuf Kalla were elected in Indonesia's first direct presidential election. Jusuf Kalla, who had worked in President Suharto's government, worried many ethnic Chinese when he stated during the election that he was considering lowering interest rates on business loans for indigenous Indonesians. This statement sparked concerns that Kalla planned to re-implement old economic policies that had favored indigenous Indonesians. In an October 2004 interview, Kalla was asked whether his proposed lending policy would be discriminatory to ethnic Chinese Indonesians, and responded, "Would you [Indonesian Chinese] choose to be discriminated against or you prefer to be burned out and hunted down?"

## C. 2004 Country Report

Candra also submitted the United States Department of State's 2004 Country Report on Human Rights Practices. According to the Country Report, the Indonesian government officially promotes racial and ethnic tolerance. In addition, the Country Report states that "[i]nstances of discrimination and harassment of ethnic Chinese Indonesians declined compared with previous years." Although former-President Megawati had called on immigration officials to stop requiring ethnic Chinese Indonesians to show citizenship papers, many ethnic Chinese citizens still reported being asked to do so. Finally, the Country Report noted that "more than 60 articles of law, regulation, or decree were in effect that discriminated against ethnic Chinese citizens."

## D. IJ's Ruling

The IJ denied Candra relief and granted him voluntary departure. Specifically, the IJ denied Candra's asylum application because it was untimely.

With regard to Candra's claim for withholding of removal, the IJ made no adverse credibility findings, but found that Candra had failed to produce any evidence to support his religious persecution claim. As to Candra's ethnic persecution claim, the IJ concluded that Candra had failed to show either that the three incidents he had cited rose to the level of persecution or that they had a sufficient nexus to his ethnicity. The IJ also concluded that Candra did not have a

well-founded fear of future persecution and that the record did not support the finding that Chinese Indonesians faced a threat was so systematic or pervasive as to amount to a pattern or practice of persecution.[1]

Candra appealed to the BIA, which adopted and affirmed the IJ's decision. Candra filed this petition for review.

## II. DISCUSSION

### A. Asylum Claim

On appeal, Candra seeks to challenge the dismissal of his asylum application as time-barred. However, we lack appellate jurisdiction to review this claim.[2] See INA § 208(a)(3), 8 U.S.C. § 1158(a)(3); Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1217 (11th Cir. 2002) ("Pursuant to 8 U.S.C. § 1158(a)(3), the Attorney General's decision regarding whether an alien complied with the one-year time limit or established extraordinary circumstances, such that the time limit should be waived, is not reviewable by any court.").

Candra argues that the IJ's legal error as to the timeliness of his asylum application constitutes a due process violation over which we have appellate

---

[1]The IJ also denied Candra CAT relief because he failed to show that the Indonesian government had any interest in him individually as a target for torture. Candra did not challenge the denial of CAT relief before the BIA and does not challenge it on petition for review to this Court. Therefore, we do not address further Candra's CAT claim.

[2]We review our subject-matter jurisdiction de novo. Brooks v. Ashcroft, 283 F.3d 1268, 1272 (11th Cir. 2002).

7

jurisdiction pursuant to the Real ID Act. Under the Real ID Act, the jurisdiction-stripping provisions of the INA are not to be construed "as precluding review of constitutional claims or questions of law . . . ." INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D). Candra's argument is foreclosed by Chacon-Botero v. U.S. Att'y Gen., in which we concluded that "[t]he timeliness of an asylum application is not a constitutional claim or question of law covered by the Real ID Act's changes." 427 F.3d 954, 957 (11th Cir. 2005).

## B.    Withholding of Removal

Candra next contends that the IJ and BIA erred in concluding that he had not established eligibility for withholding of removal.[3] An alien seeking withholding of removal must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). In other words, the alien has the burden of proof to show he "more-likely-than-not" would be persecuted on account of one of the five protected grounds if returned to

---

[3]Where, as here, the BIA expressly adopts the IJ's decision, we review both the BIA and the IJ's rulings. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). To the extent the BIA's and the IJ's decision is based on a legal determination, our review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). We review a factual determination that an alien is statutorily ineligible for withholding of removal under the substantial evidence test. Al Najjar, 257 F.3d at 1283-84. Under the substantial evidence test, "we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). The fact that evidence in the record may support a conclusion contrary to the administrative findings does not warrant reversal. Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

8

the country in question. Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). To establish eligibility, the alien must show either that he suffered past persecution or that he has a well-founded fear of future persecution. See 8 C.F.R. § 208.16(b)(1), (2); Mendoza, 327 F.3d at 1287.

### 1. Past Persecution

Candra argues that he established past persecution by showing that he was physically assaulted by Muslim high school students in 1995, robbed at knife point while riding a bus in 1997, and beaten by police during a 1998 demonstration because of his Chinese ethnicity. However, these incidents do not compel the conclusion that Candra experienced past persecution.

First, there is no clear indication that any of the incidents was motivated by Candra's Chinese heritage.[4] The first incident involved a schoolyard fight between students from different schools. The record does not disclose why or how the fight started. The second incident involved a robbery, which suggests an economic motive. Although the robber commented on Candra's ethnicity, this statement could have meant only that Candra was a worthwhile target given that the ethnic Chinese in Indonesia are widely perceived as more affluent. The comment

---

[4]On appeal Candra does not argue that these events occurred on account of his religion. Therefore, Candra has abandoned his religious persecution claim. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (explaining that issues not raised in the petitioner's brief are abandoned).

certainly does not compel the conclusion that the robber was motivated by Candra's ethnicity. The third incident involved a large, anti-corruption demonstration attended by both ethnic Chinese and indigenous Indonesian students at which the police were trying to control the crowd. In short, the motive for each of these incidents is ambiguous at best.

Furthermore, in each incident, Candra was either uninjured or received only minor injuries. Each incident was one of a kind and occurred at least one year apart. We cannot say that these three isolated incidents, occurring over the course of several years and involving no more than minor injuries, constitute the kind of mistreatment that would compel a conclusion of persecution. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005).

2.      Well-founded Fear of Future Persecution

Candra also argues that he established a well-founded fear of future persecution. To establish a well-founded fear of future persecution, the alien must show that his fear is both subjectively genuine and objectively reasonable. Al Najjar v. Ashcroft, 257 F.3d 1262, 1289 (11th Cir. 2001). Ordinarily, the alien must present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution on account of [a statutory factor]." Id. at 1287 (quotation marks omitted). However, an alien may also sustain his burden of proof without showing that he would be singled out for persecution if the alien

10

establishes (1) a pattern or practice in his home country of persecution of a group of similarly situated persons on account of one of the statutorily protected factors and (2) his inclusion in and identification with the group. See 8 C.F.R. § 208.16(b)(2)(i)-(ii).[5]

The record here does not compel the conclusion that Candra more likely than not will be singled out for persecution if he returns to Indonesia. As already noted, the three incidents relied upon by Candra appear to be isolated acts of random violence. Furthermore, Candra waited two years from the date of the 1998 incident before leaving Indonesia in September 2000. Candra's mother, father, and older brother continue to live in Indonesia, and the record does not contain any evidence that they have suffered harm in that country. Further, his mother voluntarily returned to Indonesia to assist one of her other children with an

---

[5]In relevant part, 8 C.F.R. 208.16 states:
In evaluating whether it is more likely than not that the applicant's life or freedom would be threatened in a particular country on account of race, religion, nationality, membership in a particular social group, or political opinion, the asylum officer or immigration judge shall not require the applicant to provide evidence that he or she would be singled out individually for such persecution if:

(i) The applicant establishes that in that country there is a pattern or practice of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and

(ii) The applicant establishes his or her own inclusion in and indentification with such group of persons such that it is more likely than not that his or her life or freedom would be threatened upon return to that country.
8 C.F.R. § 208.16(b)(2)(i)-(ii).

11

upcoming wedding.

Candra argues that he need not show that he likely would be singled out for future persecution because he has shown a pattern or practice of persecution against the ethnic Chinese in Indonesia. Taken as a whole, the articles and the 2004 Country report that Candra submitted indicate that, while the ethnic Chinese still endure prejudice and discrimination in Indonesia, the conditions in the country have improved significantly since the 1998 riots. Indeed, the 2004 Country Report states that instances of discrimination and racially motivated harassment against ethnic Chinese Indonesians have declined over previous years. Neither the articles nor the Country Report recount incidents of violence against ethnic Chinese Indonesians in 2004. The fact that Candra's family has lived unharmed in Indonesia for several years also undermines his claim that there is a pattern and practice of persecuting similarly situated individuals in Indonesia. We cannot say that this record compels a finding of a pattern or practice of persecution of the ethnic Chinese in Indonesia. Substantial evidence supports the BIA's and IJ's finding that Candra was not eligible for withholding of removal under the INA.

For these reasons, Candra's petition for review is dismissed as to his asylum claim and denied as to his claim for withholding of removal.

**PETITION DISMISSED IN PART AND DENIED IN PART.**

12